**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| WILLIE R. TUBBS, | } | |
| | } | |
| *Plaintiff* | } | |
| v. | } | CIVIL ACTION NO. H-06-0360 |
| | } | |
| WYNNE TRANSPORT SERVICES INC. | } | |
| | } | |
| *Defendant* | } | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Willie R. Tubbs ("Tubbs") is suing Defendant Wynne Transport Service Inc. ("Wynne"), his former employer, for defamation, invasion of privacy, false arrest, false imprisonment, malicious prosecution and race discrimination in violation of 42 U.S.C. § 1981 and Texas Labor Code section 21.001 *et seq*. (Dkt 13 Am. Compl. ¶¶ 21, 22, 23, 24, 25, 26.) Before the court are Wynne's motion for summary judgment (Dkt. 28), Tubbs's motion to strike Wynne's designated expert witness (Dkt. 35), and Tubbs's motion to refer Wynne's motion for summary judgment and other pre-trial matters to the magistrate judge (Dkt. 34). After reviewing the evidence adduced in response to Wynne's motion for summary judgment, the court concludes that Wynne's motion (Dkt. 28) should be GRANTED-in-part and DENIED-in-part. Specifically, Wynne's motion for summary judgment on Tubbs's claims for race discrimination and invasion of privacy is GRANTED; Wynne's motion for summary judgment on Tubbs's claims for defamation, false arrest, false imprisonment, malicious prosecution is DENIED.

I. <u>Facts</u>

Wynne is a trucking company located in Omaha, Nebraska. (Dkt. 28 Ex. C Swerczek Aff. ¶ 1.) Wynne transports liquid chemicals throughout the United States. (*Id.*)  It maintains a terminal in Houston to store and maintain several of its trucks.  (*Id.*)  Wynne employs approximately one hundred and twenty-five drivers nationwide.  When Tubbs worked at Wynne, four of those drivers were African American. (*Id.* ¶ 7.)

Tubbs, who is African-American, was employed by Wynne as a trucker from March to October 2005.  (Dkt. 28 Ex. B Tubbs Depo. 71:1-4.)  Tubbs was interviewed at Wynne's Houston Terminal, which later became his home terminal. (Tubbs Depo. 70:10-19.)  Although based in Houston, Tubbs delivered approximately half his loads outside Texas.  (Dkt. 36 Ex. C Dailey Decl. ¶ 5.)

At his deposition, Tubbs testified that Wynne pressured him to pick up and deliver loads even if it meant violating federal trucking regulations limiting the amount of hours a trucker can work. (Tubbs Depo. 30:3-31:24.)[1] According to Tubbs, Wynne would never explicitly instruct

---

[1] Maximum driving time for property-carrying vehicles.

Subject to the exceptions and exemptions in § 395.1:

(a) No motor carrier shall permit or require any driver used by it to drive a property-carrying commercial motor vehicle, nor shall any such driver drive a property-carrying commercial motor vehicle:

(1) More than 11 cumulative hours following 10 consecutive hours off duty; or

(2) For any period after the end of the 14th hour after coming on duty following 10 consecutive hours off duty, except when a property-carrying driver complies with the provisions of § 395.1(o) or § 395.1(e)(2).

(b) No motor carrier shall permit or require a driver of a property-carrying commercial motor vehicle to drive, nor shall any driver drive a property-carrying commercial motor vehicle, regardless of the number of motor carriers using the driver's services, for any period after --

(1) Having been on duty 60 hours in any period of 7 consecutive days if the employing motor carrier does not operate commercial motor vehicles every day of the week; or

(2) Having been on duty 70 hours in any period of 8 consecutive days if the employing motor carrier operates commercial motor vehicles every day of the week.

him to violate the law, but would assign him loads despite knowing that he was out of hours. (Tubbs Depo. 32:14-33:5; 42:4-15.)

Wynne maintains a satellite system called "Qualcomm" in all its trucks. (Dkt. 28 Ex. F Albrecht Decl. ¶ 2.)  This system, which is similar to email, connects each truck with central dispatch. (*Id.*)  Each truck has a keyboard and a small screen for the driver to send and receive messages. (*Id.*) When a message is received by the system, a light on the dashboard illuminates and a beep is emitted. (*Id.*)  As a safety precaution, the truck must be stopped to send messages. (*Id.*) Additionally, the system only allows drivers to send messages to dispatch. (*Id.* ¶ 2.) Therefore, if someone at Wynne other than dispatch sends a driver a Qualcomm message, the driver's response will go back to dispatch. (*Id.*)

Tubbs testified that when he received a Qualcomm message he would pull over at the next safe rest area to review the message and respond. (Tubbs Depo. 126:16-24.)  Tubbs was not issued a cell phone, and the Qualcomm system was the primary means of communication between him and Wynne.  (Tubbs Depo. 130:10-17) Notwithstanding this fact, Tubbs often communicated with Wynne using his private cell phone.  (Tubbs Depo. 86:14-23.)  In addition to the Qualcomm, each truck is also outfitted with a GPS device that transmits the truck's location, within ten miles, to Wynne in Omaha.  (Norton Decl. ¶ 10.)

When he joined Wynne, Tubbs attended a company orientation in Omaha. (Tubbs Depo. 50:4-6.)  Subsequently, he would periodically travel there to pick-up or drop-off loads. (Tubbs

---

(c)(1) Any period of 7 consecutive days may end with the beginning of any off-duty period of 34 or more consecutive hours; or

(2) Any period of 8 consecutive days may end with the beginning of any off-duty period of 34 or more consecutive hours.
49 C.F.R. § 395.3.

Depo. 72:14-18.)  He testified that the people he met were unfriendly, talked about him behind his back, and would give him "crude" looks. (Tubbs Depo. 73:15-74:1; 162:16-163:5.)  One of the people Tubbs met in Omaha was safety director Dave Dailey.  (Tubbs Depo. 74:7-24.)

On September 27, 2005, Tubbs requested time off to attend his wife's birthday. (Dkt. 32 Ex. D Bates WYN173 Qualcomm Request. 4.)  Wynne agreed and scheduled Tubbs to be home by 7 a.m. on October 7, 2005. (Dkt. 28 Ex. K Attach. 4.)

On October 3, 2005, Tubbs arrived in Chicago with a load. (Dkt. 28 Ex. K Attach. 5 Travel Log Oct. 3, 2005.)  While waiting to be unloaded, he sent dispatcher Phil Norton ("Norton") a Qualcomm message saying he was almost out of hours and was tired after driving all night.  (Dkt. 32, Ex.D WYN 210.) Five hours later, while Tubbs was stopped in Summit, Illinois, he received an assignment to transport a load from Rothschild, Wisconsin, to Midlothian, Texas. (Dkt. 28 Ex. K Attach. 3, 4 Qualcomm message.)  The scheduled delivery date was October 7, 2005, at 8 a.m. (*Id.*) Tubbs testified that he believed Wynne understood, based on his earlier Qualcomm message, that he was running short on hours and would have to violate the hour regulations to deliver the load.  (Tubbs Depo. 111:14-21.)

Tubbs picked up the load in Wisconsin the following day. (Tubbs Depo. 137:9-10.) He drove to Des Moines, Iowa, and stopped for the night (Dkt. 28 Ex. K Attach. 5 WYN051 Travel log).  The events of the following day, October 5, 2005, form the basis of Tubbs's claims, and the court will recount them in some detail.

Tubbs's driver log reflects that he left Des Moines at approximately noon on October 5th. (Dkt. 28 Ex. K Attach. 4 WYN052.) Earlier that morning, he had corresponded with Norton at

dispatch and submitted his previous days' hours. (*see generally* Dkt. 28 Ex. K Attach. 2[2]) Norton

updated Wynne's computer, which tracks each driver's drive time, using the information Tubbs

provided. (Dkt. 28 Ex. E Norton Decl. ¶¶ 3, 8.) He then sent Tubbs a message telling him that he

only had an hour and forty minutes of drive time available and that he should "stay legal."

(WYN141.) Tubbs testified at his deposition that he understood Norton to mean that he should

not violate the hours of service regulations. (Tubbs Depo. 112:16-22)  Tubbs responded at 11:23:

> I TOLD DISPATCH THAT WHEN THEY GAVE ME THE LOAD THAT I WAS
> TIRED AND ABOUT OUT OF HOURS.  I SHOULD HAVE RESET IN
> CHICAGO.  BUT NOW IM ON MY FINAL LOAD TO GET HOME ON TIME
> FOR MY WIFES B-DAY.  NOW YOUR WORRIED ABOUT ME STAYING
> LEGAL.  YOU GUYS DON'T WORRY ABOUT THAT WHEN UNDER A LOAD
> GIVEN TO ME LAST MINUTE AND EXPECT IT TO GET THERE

 (WYN142.) Norton testified that when he saw this message he understood Tubbs to be "blowing

off some steam." (Norton Decl. ¶ 9.)

Norton did not check Tubbs's location again until later that afternoon. (Norton Decl. ¶

10.) When he did, Norton discovered that Tubbs's was in Kansas from which he inferred that

Tubbs had violated the hours of service regulations. (*Id.*)  At 15:40, Norton sent Tubbs a

message on the Qualcomm system: "WILLIE, YOU DON'T HAVE THIS MANY HOURS

STOP AND HOLD UNTIL MIDNIGHT WHEN YOU PICK UP HRS, PHIL." (WYN134.)

Norton unsuccessfully attempted to reach Tubbs on his cell phone. (Norton Decl. ¶ 10.)  At his

deposition, Tubbs testified that he probably did not respond to Norton's message until 16:30

because he was looking for a safe place to stop. (Tubbs Depo. 127:15-128:2.) Tubbs also

---

[2] Unless otherwise stated all Qualcomm communications between Wynne and Tubbs may be found at Dkt. 28 Ex. K Attach. 2.

testified that his cellphone had been disconnected the night before, making it impossible for him to make or receive calls or messages.  (Tubbs Depo 131:3-7.)

Norton decided to take the problem to Dailey, who said he would handle the situation. (Norton Decl. ¶ 10.) In his declaration, Dailey claims Norton told him that Tubbs was over his hours and that he, Norton, could not reach Tubbs on his cell phone.  (Dailey Decl. ¶ 2.)

At 16:17, Dailey sent Tubbs a Qualcomm message: "willie you need to stop the truck now and call me Dave Dailey safety director 1-800-383-9330 omaha ext 273." (WYN 144.) Dailey also claims he called Tubbs using his cellphone and left him a message. (Dailey Decl. ¶ 4.)  Although Wynne has not produced any record of the conversation, Dailey alleges his next step, at around 16:30, was to contact the Kansas Highway Patrol and inquire whether he could have the truck stopped.  (*Id.* ¶ 6.)  According to Dailey, the dispatcher told him that the only way the highway patrol would get involved is if the truck was reported stolen.  (*Id.* ¶ 6.)

In the meantime, Tubbs stopped his truck outside Emporia Kansas at the Fly J Truck Stop and sent the following message at 16:32:

> WELL DAVE IF YOU WANT TO TALK COMMUNICATE WITH ME THRU THE QUALCOME [sic] SO WE'LL HAVE RECORD OF CONVERSATION. DISPATCH KNEW I SHOULD HAVE RESET IN CHICAGO AND THEY GIVE ME A LOAD COVERING THEY'RE ASS WHILE YOU GET ON MINE.  I GOT PLANS FOR FRIDAY AND THEY KNEW THAT.  MY HOME TIME IS IN THE COMPUTER.  7AM ON FRI SO I SHOULD HAVE RESET IN CHICAGO TO BE ABLE TO GET HOME.  BUT YOU WOULDN'T KNOW ABOUT THAT CAUSE YOU GO HOME EVERY NITE.

(WYN146.)  Tubbs testified at his deposition that, as of approximately 16:30, his truck remained stationary at the Fly J Truck Stop outside Emporia, Kansas. (Tubbs Depo. 133:4-9.)

Dailey claims he did not receive this or any of Tubbs's subsequent Qualcomm messages until the following day.  (Dailey Decl. ¶ 10.)  The records show, however,  that the messages

Tubbs sent were received by Wynne dispatch within seconds. (*See* Dkt. 28 Ex. K Attach. 2

Qualcomm Messages.)

At16:35, Dailey wrote: "willie you need to stop the truck now and call me or i will report

the truck stolen . . ." (WYN147.)

At 16:37 Tubbs responded: "TRUCKS GOTTA BE STOPPED TO COMMUNICATE

DAVE YOU SHOULD KNOW THAT SAFETY DIR." (WYN148.)

At 16:45, he added:

HEY DAVE ASK DISPATCH WHY DID THEY GIVE ME THE LOAD WHEN I
SHOULD HAVE RESET??? THATS THE QUESTION 2 ASK IF WYNNE IS SO
COMMITTED TO ON TIME DELIVERY AND I DIDN'T HAVE THE HOURS.
BUT YOU DIDN'T LOOK AT DID YOU.

(WYN149.)

At 16:47 Dailey wrote: "since you have not returned my calls and you will not answer

when i call you i have reported the truck stolen." (WYN150.)

Tubbs responded at 16:49: "TELL THEM IM IN EMPORIA AND ID LOVE TO TALK

TO THEM.  I'M AT THE FLY J." (WYN152.)

At 17:00, Dailey called the Omaha Police Department and filed a stolen vehicle report.

(Dkt. 32 Ex. D WYN002.) The report's synopsis states:

Wed – 10/5/05 at 17:00 hrs – Reporting Sgt. Connely 1373 received a phone call
from reporting party, Dave Daley [sic], that one of his employees Willie Tubbs had
failed to follow a directive to remain in Des Moines, IA, today after he delivered his
freight there.  Tubbs will not answer his phone or respond to text messages sent by
Daley [sic].  Tubbs is believed to be headed to Houston, Tx.

 (*Id.*)  The report contains Tubbs's address, telephone number, date of birth, gender and race.

(*Id*.)  Dailey alleges he explained the entire situation to the officer, and it was only at her

prompting that he agreed to report the Truck stolen. (Dailey Decl. ¶ 8.)

Tubbs was arrested at the Flying J by Kansas Highway Patrol. Although the arrest report (Dkt.32 Ex. R) states that Tubbs was cooperative, the officers arrested Tubbs with guns drawn (Tubbs Depo. 143:14-144:6.)  After being handcuffed, Tubbs was taken to jail wearing a pair of shorts, a tank top and sandals.  Despite having been informed of his arrest, Wynne did nothing to secure Tubbs's release. Dailey states that he believed Tubbs's arrest to be unrelated to his stolen vehicle report.  (Dailey Decl. ¶ 9.)  Tubbs was released two days later. (Tubbs Depo. 152:6-9.) A supplementary report filed in Omaha reflects that the claim against Tubbs was unfounded and that he lacked criminal intent.  (Dkt. 32 Ex.T.)  From the record before the court, it does not appear that criminal proceedings were ever instituted against Tubbs in either Kansas or Nebraska.       On October 6, 2005, while Tubbs was still in jail, Wynne sent Tubbs a letter terminating his employment. (Dkt. 28 Ex. K Attach. 9 Termination Letter)  The stated reason for Tubbs's termination was his failure to communicate with Wynne on October 5, 2005.  (*Id.*)

II. Legal Standard

   *A. Summary Judgement*

The movant seeking a federal summary judgment initially must inform the court of the basis for his motion and point out those portions of the pleadings, depositions, answers to interrogatories, and admissions on file that demonstrate the absence of a genuine issue of material fact and show that he is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant need not negate the opposing party's claims nor produce evidence showing an absence of a genuine factual issue, but may rely on the absence of evidence to support essential elements of opposing party's claims. *International Assoc. of Machinists & Aerospace Workers, Lodge No. 2504 v. Intercontinental*

*Mfg. Co.*, 812 F.2d 219, 222 (5th Cir. 1987).  The burden then shifts to the non-movant to set forth specific facts and competent summary judgment evidence to raise a genuine issue of material fact on each essential element of any claim on which he bears the burden of proof at trial.  Fed. R. Civ. P. 56(c).  The substantive law governing the suit identifies the essential elements of the claims at issue and therefore indicates which facts are material.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The non-moving party may not rest on mere allegations or denials in its pleadings, but must produce affirmative evidence and specific facts.  *Anderson*, 477 U.S. at 256-57.  He meets this burden only if he shows that "a reasonable jury could return a verdict for the non-moving party."  *Id.* at 254.  A mere scintilla of evidence will not preclude granting of a motion for summary judgment.  *Id.* at 252.

All reasonable inferences must be drawn in favor of the non-moving party.  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574. 587-88 (1986), citing *United States v. Diebold*, 369 U.S. 654, 655 (1962).  Once the burden of proof has shifted to the non-movant, he "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Id.* at 586.  Instead he must produce evidence upon which a jury could reasonably base a verdict in his favor.  *Anderson*, 477 U.S. at 249.  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Id.*, 477 U.S. at 249-50.  Moreover the non-movant must "go beyond the pleadings and by her own affidavits or by depositions, answers to interrogatories and admissions on file, designate specific facts that show there is a genuine issue for trial."  *Webb v. Cardiothoracic Surgery Assoc. of North Texas, P.A.*, 139 F.3d 532, 536 (5th Cir. 1998).

Unsubstantiated and subjective beliefs and conclusory allegations and opinions are not competent summary judgment evidence. *Grimes v. Texas Dept. of Mental Health and Mental Retardation*, 102 F.3d 137, 139-40 (5th Cir. 1996); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994); *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir.), *cert. denied*, 506 U.S. 825 (1992). Nor are pleadings summary judgment evidence. *Wallace v. Texas Tech University*, 80 F.3d 1042, 1046 (5th Cir. 1996), *citing Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)(*en banc*). The non-movant cannot discharge his burden by offering vague allegations and legal conclusions. *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992); *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 889 (1990). Nor is the district court required by Rule 56 to sift through the record in search of evidence to support a party's opposition to summary judgment. *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998), *citing Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir.), *cert. denied*, 506 U.S. 832 (1992).

   *B. Discrimination Under Section 1981 and Texas Labor Code section 21.001 et seq.*

   Section 1981 guarantees ""[a]ll persons within the jurisdiction of the United States ... the same right ... to make and enforce contracts" regardless of race. 42 U.S.C. § 1981(a). "Claims of racial discrimination brought under § 1981 are governed by the same evidentiary framework applicable to claims of employment discrimination brought under Title VII." *LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444, 448 n.2 (5th Cir. 1996); *see also Walker v. Thompson*, 214 F.3d 615, 625 (5th Cir. 2000). Texas courts construe the TCHRA consistently with federal law interpreting Title VII. *See Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 n.2 (5th Cir. 1999) ("The law governing claims under the TCHRA and Title VII is identical."); *Caballero*

*v. Cent. Power & Light Co.*, 858 S.W.2d 359, 361, 36 Tex. Sup. Ct. J. 918 (Tex. 1993) ("Another stated purpose [of the TCHRA] is to coordinate and conform with federal law under Title VII of the Civil Rights Act of 1964, as amended." (internal citations omitted)).

In the absence of direct evidence of discrimination, a plaintiff must proceed under the *McDonnell Douglas* burden shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, the initial burden lies with the plaintiff to plead a *prima facie* case. A *prima facie* case of race discrimination is evidence that plaintiff (1) is a member of a protected class; (2) was qualified for his position; (3) was discharged or suffered some other adverse employment action; and (4) was replaced with a person outside of the protected class, or was treated less favorably than similarly situated employees of a different race. *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512-13 (5th Cir. 2001). If the plaintiff meets his burden, then the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for the adverse employment action. *Okoye*, 245 F.3d at 515. If defendant can do so the presumption of discrimination falls away and plaintiff must introduce evidence creating a jury question as to whether the defendant was motivated by discriminatory animus. Plaintiff meets this burden by showing either that defendant's articulated reason was pretextual (pretext alternative), or that race was a motivating factor in the decision (mixed motives alternative). *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004).

If the plaintiff can show that the employer's asserted justification is false, this showing, coupled with a prima facie case, may permit the trier of fact to conclude that the employer discriminated against the plaintiff. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000). However, such a showing will not always be enough to prevent summary judgment, such

as when a plaintiff has established a prima facie case and set forth sufficient evidence to reject

the defendant's explanation, yet "no rational factfinder could conclude that the action was

discriminatory." *Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002) (quoting *Reeves*,

530 U.S. at 148). Whether summary judgment is appropriate depends on numerous factors,

including "the strength of the plaintiff's prima facie case, the probative value of the proof that the

employer's explanation is false, and any other evidence that supports the employer's case and that

properly may be considered." *Id.* (*quoting Reeves*, 530 U.S. at 148-49).

     *C. Choice of Law.*

     Federal courts sitting in diversity must apply the choice-of-laws provisions of the state in

which they sit. *Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 496, 85 L. Ed. 1477, 61

S. Ct. 1020 (1941); *Duhon v. Union Pac. Resources Co.*, 43 F.3d 1011, 1013 (5th Cir. 1995). In

*Gutierrez v. Collins*, the Texas Supreme Court adopted the approach of the Restatement

(Second) of Conflicts. 583 S.W.2d 312, 319 (Tex. 1979).  This approach is popularly referred to

as "the most significant relationship test."  Section 6 of the Restatement enumerates the relevant

factors to consider in any choice of law analysis; these include: "(a) the needs of the interstate

and international systems; (b) the relevant policies of the forum; (c) the relevant policies of other

interested states and the relative interests of those states in the determination of the particular

issue; (d) the protection of justified expectations; (e) the basic policies underlying the particular

field of law; (f) certainty, predictability and uniformity of result; and (g) ease in the

determination and application of the law to be applied. *Gutierrez* at 319 (quoting

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 (1971)).  Section 145 lists factual

matters generally applicable to all torts, these include: "(a) the place where the injury occurred;

(b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered." *Id.* In addition to these sections, which are generally applicable to all torts, the Restatement contains rule sections addressing specific torts where the law is sufficiently settled.  *See generally* Title B of the RESTATEMENT (SECOND) OF CONFLICTS OF LAWS.  Sections 149 (Defamation) and 155 (Malicious Prosecution) are particularly relevant to this case.  Section 149 provides: "In an action for defamation, the local law of the state where the publication occurs determines the rights and liabilities of the parties . . . unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties . . ." Section 155 provides: "The rights and liabilities of the parties for malicious prosecution or abuse of process are determined by the local law of the state where the proceeding complained of occurred, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied."

In this case Wynne urges the court to apply Nebraska law and Tubbs urges the court to apply Texas law.   Evaluating the Restatement factors, however, and giving particular weight to Kansas's interest in preserving the integrity of its law enforcement assets, the court believes Kansas has the most significant relationship to plaintiff's claims for defamation, false arrest, false imprisonment and malicious prosecution. Dailey's statements were purposefully directed toward Kansas law enforcement and by his actions he procured Tubbs's arrest by the Kansas highway patrol.  After his arrest Tubbs was jailed in Kansas.   Accordingly, the court finds that,

with regard to Tubbs's claims for defamation, invasion of privacy, false arrest, false imprisonment and malicious prosecution, Kansas law governs.

   *D. Legal Standard: Defamation, False Arrest/Imprisonment, and Malicious Prosecution*

   Under Kansas law the elements of a claim for defamation are (1) false and defamatory words (2) communicated to a third person (3) which result in harm to the reputation of the person defamed. *Lindemuth v. Goodyear Tire & Rubber Co.*, 19 Kan. App. 2d 95, 102, 864 P.2d 744 (1993). Kansas does not recognize defamation per se. *Zoeller v. American Family Mut. Ins. Co.*, 17 Kan. App. 2d 223, 229 (Kan. Ct. App. 1992).

   In this case, Wynne claims that Dailey's statements are conditionally privileged.  In *Faber v. Byrle*, the Kansas Supreme Court explained that "a communication to an officer of the law charging a person with a crime, made in an honest effort to recover stolen property and for the purpose of detecting and punishing the criminal, is privileged and that where in such an action there is no proof of malice, a demurrer to the evidence is rightly sustained."  171 Kan. 38, 43 (Kan. 1951).   The burden of showing malice rests with the plaintiff. *Id.*

   Actual malice is defined as "evil mindedness or specific intent to injure." *Turner v. Halliburton Co.*, 240 Kan. 1, 8 (Kan. 1986) (*quoting Munsell v. Ideal Food Stores,* 208 Kan. 909, 920-21 (1972)). Actual malice is generally a question for the jury. *Id.*  Nevertheless,

> If the plaintiff fails to offer evidence of an extrinsic character to prove actual malice on the part of the defendant, in the publication of a libel on a qualifiedly privileged occasion, and if the language of the communication and the circumstances attending its publication by the defendant are as consistent with the nonexistence of malice as its existence, there is no issue for the jury.

*Id.* (*quoting Marsh v. Commercial and Savings Bank of Winchester, Va.*, 265 F.Supp. 614, 621 (W.D. Va. 1967)).

False arrest and false imprisonment are indistinguishable causes of action under Kansas law. *Holland v. Lutz*, 194 Kan. 712, 714 (Kan. 1965). To establish false arrest/imprisonment plaintiff must show that he "was unlawfully caused to be arrested by the defendants . . ." *Thompson v. General Finance Co.*, 205 Kan. 76, 87-88 (Kan. 1970). Causation is established by evidence that defendants either instigated, assisted in, or by some means directed, countenanced or encouraged plaintiff's arrest or imprisonment. *Id.* at 88. Malice is not an element of a claim for false arrest/imprisonment. *Id.* at 88-89. Malice becomes material only if plaintiff seeks exemplary damages. *Id.* at 89.

An action for malicious prosecution consists of evidence that the defendant, acting with malice and without probable cause, instituted a criminal proceeding of which complaint is made, that the proceeding terminated in favor of the plaintiff, and that the plaintiff sustained damages. *Thompson*, 205 Kan. at 91

III.  Application of Law to the Facts

Wynne has moved for summary judgment on all of Tubbs's claims. After weighing the evidence in the light most favorable to Tubbs, the court concludes the Wynne's motion should be granted as it relates to Tubbs's claims for race discrimination and invasion of privacy and denied as it relates to Tubbs's claims for defamation, false arrest/imprisonment, and malicious prosecution.

A.  *Race Discrimination.*

Tubbs points to no evidence that he was treated less favorably than similarly situated Caucasian employees. He has, therefore, failed to state a prima facie case of race discrimination. What evidence Tubbs has introduced is limited to evidence that Caucasian drivers who violated

the hours of service regulations were not fired. Tubbs, however, was not fired for violating the hours of service regulations, he was fired for failing to follow Wynne's directive to "stay legal." Thus, these drivers are not similarly situated comparators for the purpose of examining whether they received preferential treatment.

Tubbs has also failed to introduced evidence that race was a motivating factor in Wynne's decision to terminate his employment.  In this regard, Tubbs's evidence of racial animus is limited to hearsay statements that Caucasian drivers received more loads to haul, his own subjective belief that people were unfriendly to him, statistical evidence that Wynne had a predominantly Caucasian workforce, and another African American driver's statement that he and Tubbs were referred to as guinea pigs by a recruiter at their orientation.  None of this evidence could support a jury's verdict.  First, Tubbs's testimony concerning what other driver's said is not admissible evidence.  Tubbs has neither identified the drivers who allege they received more loads nor suggested that they would testify.  Second, Tubbs's subjective opinion that people were unfriendly to him is not evidence of racism on the part of the decision makers in his case.  *See Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 405 (5th Cir. 1999). Third, statistical evidence  that Wynne's workforce is predominantly Caucasian, without more, is insufficient to survive summary judgement. *See Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 345 (5th Cir. 2005).  Fourth, Tubbs's co-worker's statement that, 5 months before Tubbs's was terminated, a recruiter referred to him and Tubbs as guinea pigs is too attenuated from the facts of this case to support a jury's verdict.  Accordingly, Tubbs's claims for race discrimination must be dismissed.

> *B. Defamation, Invasion of Privacy, False Arrest/Imprisonment and Malicious Prosecution.*

16

Wynne has moved for summary judgment on Tubbs's defamation, invasion of privacy, false arrest/imprisonment and malicious prosecution claims. Wynne bases its motion on two determinations of fact: one, that Dailey's statements to the police were essentially truthful, and two, that there is no evidence that Dailey acted with bad faith or actual malice. Because the court concludes that these issues are contested and that a jury could return a verdict in Tubbs's favor, it denies Wynne's motion.

The court will first discuss Wynne's allegation that Dailey's statements to the police were materially true. Material truth is an affirmative defense to a defamation claim. *See Turner*, 240 Kan. at 7. It is, therefore, Wynne's burden to show that Dailey's statements to the police were truthful. His statements were (1) that Tubbs stole Wynne's truck; (2) that Tubbs refused to comply with a company directive to remain in Des Moines, Iowa, (3) that Tubbs delivered a load in Des Moines Iowa, (4) that Tubbs was refusing to respond to text messages sent by Wynne over the Qualcomm System and (5) that Tubbs was believed to be headed to Houston, Texas. (Compl. ¶ 13.) Tubbs has introduced record evidence establishing the falsity of each of these statements. First, there is no allegation that Tubbs ever intended to permanently deprive Wynne of the use or possession of its truck or cargo, a necessary element of the crime of theft under both Nebraska and Kansas law.[3] *See* K.S. § 21-3701; N. R. S. § 28-511. Second, the Qualcomm communications between Tubbs and Wynne show that Tubbs was not ordered to stay in Des

---

[3]Wynne argues that Dailey's statement was materially true because Tubbs continued to drive without Wynne's authorization after his hours expired. (Mot. Summ. J. 24; Reply 25.) According to Wynne, this conduct constitutes the crime of theft under Kansas and Nebraska law. (*Id.*) Rather than cite the relevant provisions of Kansas and Nebraska's criminal code, however, Wynne chooses to cite provisions addressing, in the case of Kansas, "criminal deprivation of property," K. S. A. § 21-3705, and, in the case of Nebraska, "unauthorized use of a propelled vehicle," R.R.S. Neb. § 28-516. These are not the sections of the Kansas and Nebraska codes dealing with theft. Rather, as cited above, the relevant sections are Kansas Statutes § 21-3701 and Nebraska Revised Statutes § 28-511. Under both of these statutes theft includes a *mens rea* element of intent to permanently deprive the victim of his property.

Moines, did not deliver a load in Des Moines, had been communicating with Wynne over the Qualcomm System, and was headed to Midlothian, Texas.  A material question of fact therefore exists regarding what statements were made to the police and the material truth or falsity of those statements.

Wynne's final argument is that, even if Dailey's statements were false, Tubbs has no evidence that Dailey acted out of malice.  The court disagrees.   From the evidence presented in response to Wynne's motion, a jury could infer that Dailey acted with intent to injure when he made his report. Tubbs has presented direct evidence that Wynne received his Qualcomm messages within seconds of their being sent, and it is undisputed that Dailey had access to these messages as well as to the GPS system.  A jury could infer from this evidence that Dailey received Tubbs's responses, knew he was stopped at the Flying J, and chose to report the truck stolen anyway.  This is sufficient evidence of malice to survive summary judgment.

Tubbs has succeeded in establishing a material issue of fact regarding two grounds on which Wynne moved for summary judgement.  On the issue of malicious prosecution, however, the court is concerned about the lack of evidence of criminal proceedings against Tubbs in Nebraska or Kansas.  The court, therefore, raises the issue *sua sponte* and orders the parties to brief whether Tubbs can maintain a malicious prosecution claim under either state's law in the absence of an indictment or similar charging instrument.

Tubbs has not responded to Wynne's motion for summary judgment on his claim for invasion of privacy.  This confirms the court's view that, from the summary judgement record, no invasion of privacy claim exists. *See generally Froelich v. Adair*, 516 P.2d 993, 995 (Kan.

1973) (adopting the approach taken by the RESTATEMENT (SECOND) OF TORTS and

outlining the different types of invasion of privacy claims available to a plaintiff).

> *C. Tubbs's objections to Wynne's summary judgment evidence and Motion to Strike Wynne's Expert witness.*

Tubbs has objected to some of the evidence attached to Wynne's motion for summary

judgment and moved to strike Wynne's expert witness, Donald G. Montgomery

("Montgomery").  The court has not relied on the specific items objected to in granting Wynne's

motion for summary judgment on Tubbs's discrimination claims.  Tubbs's objections are

overruled. Tubbs may, should the need arise, re-urge his objections at trial.

Wynne's expert is a self described expert in the fields of transportation and workplace

safety. (Dkt.28, Ex. G Resume of Montgomery.)  Montgomery has a degree in business, a

commercial driver's license, and various certificates related to workplace and transportation

safety.(*Id.*)  Before becoming a consultant in 2003, Montgomery was employed by several

transport companies as a safety manager or supervisor.  If called by Wynne, he will offer his

opinion (1) that on October 5, 2005, Tubbs failed to comply with 49 C.F.R. 395.3 and, by doing

so, failed to act in a safe, legal and prudent manner; (2) that Tubbs could have delivered his load

in Midlothian and arrived in Houston without violating 49 C.F.R. 395.3; (3) that Wynne could

have been fined or assessed criminal penalties for knowingly allowing Tubbs to drive in

violation of  49 C.F.R. 395.3; (4) that, based on DOT's Inspection Selection System, Wynne had

good safety controls in place; and (5) that Wynne was justified in taking steps to stop Tubbs

from continuing to drive in violation of  49 C.F.R. 395.3. (*See* Dkt. 28 Ex. G Expert Report Op.

1, 2, 3, 4, 5, 6.)

Federal Rule of Evidence 702 requires expert testimony to "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. The proper interpretation of the Code of Federal Regulations is a question of law for the court, but Montgomery's interpretation of how the Code practically affects the operation of a trucking enterprise is relevant to the resolution of this case. Accordingly, Tubbs's motion to strike is denied.

IV. Conclusion

For the aforementioned reasons, the court ORDERS that Wynne's motion for summary judgment (Dkt. 28) is GRANTED as to Tubbs's claims for race discrimination and invasion of privacy and DENIED as to Tubbs's claims for defamation, false arrest/imprisonment and malicious prosecution.  Tubbs's motion to strike Wynne's expert (Dkt. 35) is DENIED.   Tubbs' motion to refer (Dkt. 34) is moot.

Signed at Houston, Texas, this 19th day of Apri, 2007.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE